UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------X
RANKINS, DAVID                          :
                        Petitioner,   :          09 Civ. 2181 (KMW)
                                        :
          -against-                 :          **Opinion & Order**
                                        :
UNITED STATES OF AMERICA,      :
                        Respondent.   :
-------------------------------------------------------X
WOOD, U.S.D.J.:

      David Rankins, proceeding pro se, petitions for a writ of habeas corpus pursuant to 28 U.S.C. § 2255 ("Section 2255"), and asks the Court to vacate, set aside, or correct his sentence. Petitioner claims that the Government (1) committed prosecutorial misconduct by presenting false evidence at trial, and (2) failed to provide exculpatory and impeachment information as required under *Brady v. Maryland*, 373 U.S. 83 (1963), *Giglio v. United States*, 405 U.S. 150 (1972), and Federal Rule of Criminal Procedure 16.

      For the reasons set forth below, the Court DENIES the petition.

**I. BACKGROUND**

      **A. The Argentina Enterprise**

      In 2001, pursuant to a forty count indictment, Ray Argentina and other defendants were charged with engaging in a racketeering enterprise involving fraudulent real estate transactions, extortion, assaults, and drug trafficking (the "Enterprise"). (*See United States v. Argentina*, No. 01-CR-0024, Superseding Indictment, Mar. 18, 2002 [Cr. Dkt. No. 108]). As an accomplice to the Enterprise, Petitioner was charged in six of the forty counts.

      The Enterprise's real estate schemes followed a general pattern. An Enterprise member would purchase the property from a seller at fair market value (the A-to-B sale). (Petitioner's

PSR ¶ 133, prepared April 4, 2003).  Prior to closing, the Enterprise member would enter into an agreement to resell the property to an accomplice "straw purchaser" at an inflated value (the B-to-C sale).  (*Id.*).  The straw purchaser's goal would be to obtain a mortgage based on the inflated value, repay the original seller at fair market value, and retain the profit for the Enterprise.

In order to assist the straw purchaser in obtaining the inflated mortgage, an Enterprise accomplice would provide a false appraisal of the property.  (*Id.* ¶ 134).  An accomplice lender would then create fraudulent mortgage documents indicating that a mortgage existed for the straw purchaser at the inflated value.  (*Id.* ¶¶ 133-134).  This fraudulent mortgage would then be sold to a secondary mortgage company that, relying on the fraudulent documentation and vetting of the initial mortgage company, would acquire the mortgage at the inflated value.  (*Id.* ¶¶ 135-136).  The loan obtained from the secondary mortgage company would pay the original seller fair market value, with the defendants retaining the excess as profit.  (*Id.* ¶ 137).

### B. **Petitioner's Offense Conduct**

On September 25, 2002, after a seven-week trial,[1] the jury convicted Petitioner on each of the six counts charged—one count of conspiracy to commit mail fraud, bank fraud, and fraud against the Department of Housing and Urban Development ("HUD") (18 U.S.C. § 371); two counts of mail fraud (§§ 1341, 1342); two counts of wire fraud (§§ 1343, 1342); and one count of fraud against HUD (§§ 1010, 1012).  (*See* PSR 1).  The jury found that Petitioner acted as a straw purchaser of two properties.  Petitioner's conduct with respect to each straw purchase is detailed below.

---

[1] The trial and related sentencings were before the Honorable John S. Martin Jr.  Because Judge Martin had retired by the time this petition was filed, the petition was assigned to the undersigned.

### 1. 625 Franklin Avenue

The scheme with respect to the property at 625 Franklin Avenue, Brooklyn, New York ("625 Franklin") followed the general pattern outlined above. The original owner of 625 Franklin sold the property to Private Notes Incorporated ("Private Notes")—a company operated by an Enterprise member—for $155,000 (the A-to-B sale). (PSR ¶¶ 147, 109). Shortly thereafter, the Enterprise resold the property to Petitioner for $275,000 (the B-to-C sale). (PSR ¶ 147). Petitioner financed his purchase with a false loan application, approved by First National Funding of New Jersey ("FNF"). (*Id.* ¶ 148). This loan was backed by HUD. (*Id.* ¶ 147).

In order to obtain the loan in Petitioner's name, Enterprise members provided false appraisal reports stating that improvements made to the property resulted in a significant increase in value. (*Id.* ¶¶ 125,148). Petitioner also falsely stated in his loan application that he planned to use the 625 Franklin Avenue property as his primary residence, and falsely represented that he had sufficient funds for the closing. (*Id.* ¶ 148). FNF ultimately approved the $275,000 loan. Of that amount, $155,000 was used to finance the original sale and the remainder was divided between the Argentina Enterprise members. (*Id.*). The scheme resulted in an approximate loss of $120,000 to HUD and FNF. (*Id.* ¶¶ 154, 162 & n.7).

### 2. 1065 Fulton Street

The scheme relating to the property at 1065 Fulton Street, Brooklyn, New York ("1065 Fulton") followed the same general pattern, but with additional steps designed to make it appear that the B-to-C sale was a valid, arms-length transaction. Again, Petitioner's false statements and fraudulent loan application played a critical role in the scheme.

Hillcrest Homes sold 1065 Fulton to a middleman, for fair market value of $199,000 (the A-to-B sale). (PSR ¶ 143). Before the sale was consummated, BJM flipped the property to the

3

straw purchasers, Petitioner and an accomplice, for $348,000 (the B-to-C sale). (*Id.*). Petitioner financed the sale with a mortgage loan from Bayview Financial Trading Group ("Bayview"). (*Id.* ¶ 144). In his loan application, Petitioner stated falsely that he and the accomplice planned to live together at the property. Petitioner also concealed his ownership of other properties. (*Id.* ¶ 143). An appraiser involved with the fraudulent scheme appraised the 1065 Fulton Street property at $348,000, although the property was actually worth only $199,000. (*Id.*).

Petitioner gave a $261,000 note to the middleman when purchasing the property, which a separate Enterprise-affiliated mortgage broker, Cape Cod Funding, bought and subsequently sold to Bayview for $247,000. (*Id.* ¶¶ 112, 145). Once Cape Cod received the $247,000 mortgage loan check from Bayview, it paid Hillcrest Homes the fair market value of $199,000. (*Id.* ¶ 146). Accordingly, title passed to the middleman, and subsequently to Petitioner and his accomplice. (*Id.*). The remaining profits from the loan were again divided among the members of the Enterprise. (*Id.*). The scheme resulted in a $62,000 loss to Bayview (*Id.* ¶ 162 & n.7).

C. **Procedural History**

After a seven-week trial, the jury convicted Petitioner on each of six counts charged and found that he acted as a straw purchaser of both the 625 Franklin and 1065 Fulton properties. Petitioner moved for a judgment of acquittal, pursuant to Federal Rule of Criminal Procedure 29(c), and for a new trial, pursuant to Rule 33. [Cr. Dkt. No. 169]. The Court denied these motions and sentenced Petitioner to fifteen months' imprisonment. [Cr. Dkt. No. 262, Ex. B]. Petitioner appealed, and on July 1, 2005, the United States Court of Appeals for the Second Circuit, in a summary order, affirmed Petitioner's conviction, vacated his sentence, and remanded for resentencing. *United States v. Argentina*, 137 F. App'x 428 (2d Cir. 2005).

On February 3, 2006, Petitioner filed another Rule 33 motion, which the Court denied as untimely on February 9, 2007. [Cr. Dkt. No. 287]. Shortly thereafter, Petitioner was resentenced to fifteen months' imprisonment and one year of supervised release. [Cr. Dkt. No. 290]. Petitioner again appealed, but the Second Circuit rejected his appeal, affirming the judgment of conviction and the Court's denial of the Rule 33 motion in a June 4, 2008 summary order. *See United States v. Argentina*, 280 F. App'x 100 (2d Cir. 2008).

After serving his sentence, Petitioner was released from prison on or about May 2, 2008. His one-year term of supervised release expired on or about May 2, 2009. Petitioner filed his initial Section 2255 petition on March 9, 2009, during the period of his supervised release; thus, his petition is timely. *See Scanio v. United States*, 37 F.3d 858, 860 (2d Cir. 1994).

## II.   GOVERNING LEGAL PRINCIPLES

Section 2255 allows a convicted person to petition the sentencing court for an order vacating, setting aside, or correcting his sentence. *See* 28 U.S.C. § 2255. Relief pursuant to Section 2255 is available "only for constitutional error, a lack of jurisdiction in the sentencing court, or an error of law or fact that constitutes a 'fundamental defect which inherently results in a complete miscarriage of justice.'" *United States v. Bokun*, 73 F.3d 8, 12 (2d Cir. 1995) (quoting *Hill v. United States*, 368 U.S. 424, 428 (1962)). The Court construes Petitioner's pro se submissions to "raise the strongest arguments that they suggest." *Pabon v. Wright*, 459 F.3d 241, 248 (2d Cir. 2006) (internal quotation marks and citations omitted).

The purpose of a Section 2255 petition is not to "relitigate questions which were raised and considered on direct appeal." *Cabrera v. United States,* 972 F.2d 23, 25 (2d Cir.1992). Absent an intervening change in law or circumstance, a petitioner cannot raise a claim in a habeas proceeding "when the events underlying the claim were the same as those underlying a

5

claim raised and decided on the merits on direct appeal." *Yick Man Mui v. United States*, 614 F.3d 50, 53 (2d Cir. 2010); *see also United States v. Perez*, 129 F.3d 255, 260 (2d Cir. 1997) ("A 2255 motion may not relitigate issues that were raised and considered on direct appeal."); *Chin v. United States,* 622 F.2d 1090, 1092 (2d Cir. 1980) ("Reconsideration is permitted only where there has been an intervening change in the law and the new law would have exonerated a defendant had it been in force before the conviction was affirmed on direct appeal.").

Moreover, "to conserve judicial resources and to respect the law's important interest in the finality of judgments," claims that were "not raised on direct appeal may not be raised on collateral review," *Massaro v. United States*, 538 U.S. 500, 504 (2003), unless the petitioner shows either: (1) cause and prejudice for the failure to raise the claim; or (2) that the petitioner is actually innocent of the crime.  *Bousley v. United States,* 523 U.S. 614, 622 (1998).  To establish "cause" for failure to raise a claim on direct appeal, a petitioner must show "some objective factor external to the defense" that prevented the petitioner from complying with the procedural requirement.  *See McClesky v. Zant*, 499 U.S. 467, 493 (1991); *Clark v. Perez*, 510 F.3d 382, 393 (2d Cir. 2008).  To establish actual prejudice, the petitioner "must shoulder the burden of showing, not merely that the errors at trial created a possibility of prejudice, but that they worked actual and substantial disadvantage, infecting his entire trial with error of constitutional dimensions."  *United States v. Frady*, 456 U.S. 152, 170 (1982).

### III.  ANALYSIS

In his numerous submissions to the Court,[2] Petitioner raises a variety of arguments that fall into two general categories.  Petitioner contends that the Government (1) committed

---

[2] These submissions include: 3/9/2009 Submission [Cv. Dkt. No. 1]; 5/18/2009 Submission [Cv. Dkt. No. 5]; 11/11/2009 Submission; 1/19/2010 Submission; 3/8/2010 Submission, 7/5/2011 Submission; 9/29/2011 Submission [Cv. Dkt. No. 13]; 11/14/2011 Submission, 4/4/2012 Submission.

prosecutorial misconduct by presenting false evidence at trial, and (2) failed to provide exculpatory and impeachment information as required by *Brady*, *Giglio*, and Rule of Criminal Procedure 16(a)(1)(E).[3]

### A. Prosecutorial Misconduct

Prosecutorial misconduct that violates a defendant's constitutional right to a fair trial occurs when a prosecutor knowingly uses false testimony or false evidence at trial. *See United States v. Agurs*, 427 U.S. 97 (1976); *Napue v. Illinois*, 360 U.S. 264 (1959); *Drake v. Portuondo*, 553 F.3d 230 (2d Cir. 2009).To demonstrate that prosecutors engaged in such unconstitutional misconduct, a petitioner must establish that "(1) there was false testimony, (2) the Government knew or should have known that the testimony was false, and (3) there was 'any reasonable likelihood that the false testimony could have affected the judgment of the jury.'" *United States v. Helmsley*, 985 F.2d 1202, 1205 (2d Cir. 1993) (quoting *Agurs*, 427 U.S. at 103). Petitioner argues that the Government committed prosecutorial misconduct because it knew that he did not commit fraud, that in fact he was a victim of fraud, and that the alleged victims of the scheme were the ones committing fraud. The Court rejects this claim as both procedurally barred and without merit.

In his first appeal to the Second Circuit, Petitioner filed a brief alleging that the Government "withheld exculpatory information" and "engaged in prosecutorial misconduct" in violation of his due process rights. (*See* Pet.'s 6/30/2004 Br. 12, 20). In support of that claim, Petitioner argued that the Government knew that the lenders in his case had knowledge of the

---

[3] Petitioner also requests an evidentiary hearing. A district court has discretion over whether to grant such a hearing. *See Chang v. United States*, 250 F.3d 79, 85-86 (2d Cir. 2001). To warrant a hearing, the Court must find that the hearing would "offer any reasonable chance of altering its view of the facts." *Id*. at 86. As evident from this Opinion, the Court finds that "the motion and the files and records of the case conclusively show that [Petitioner] is entitled to no relief." 28 U.S.C. §2255(b). Accordingly, because the briefs and supporting record make clear that no "plausible" claim exists, the Court denies Petitioner's request. *See Puglisi v. United States*, 586 F.3d 209, 213 (2d Cir. 2009).

fraudulent scheme, but failed to disclose this information and actively misrepresented the roles and practices of the lenders. (*Id.* at 13, 26-27). In a post-argument supplemental brief, Petitioner again contended that the lenders he was accused of defrauding had participated in the house flipping fraud, and that these abusive and fraudulent lending practices created a situation in which "a borrower's statements whether false or not have no bearing on the actions of lenders." (*See* Pet.'s 6/7/2005 Br. 1, 12). The Second Circuit considered and rejected these arguments. *See* 137 F. App'x. 428, 2005 WL 1540877. Accordingly, to the extent that Petitioner's reasserts these arguments in his habeas petition (*see* 5/18/2009 Submission 1), the claim is procedurally barred. *See Yick Man*, 614 F.3d at 53.

Even considering Petitioner arguments on the merits, however, the Court finds that no prosecutorial misconduct occurred. Petitioner first argues that the Government should have known that the alleged victims of the Enterprise's mortgage schemes were not victimized in the secondary mortgage market, but were in fact the loan originators. He supports this assertion by citing unrelated instances in which the Government arrived at similar conclusions. (*E.g.*, 11/11/2009 Submission 15; 11/14/2011 Submission 2-3, 8-10, 23-25; 4/4/2012 Submission 3-6). For example, Petitioner points to the complaint in *United States v. Deutsche Bank*, No. 11 Civ. 2976 (S.D.N.Y. 2011) (Kaplan, J.), in which the DOJ relied on HUD policies and procedures to demonstrate primary lender culpability for wrongful loan origination practices undertaken by third party mortgage brokers. (*See* 7/5/2011 Submission 2, 6). The *Deutsche Bank* lenders were charged with failing to conduct HUD-mandated due diligence. Petitioner utterly fails, however, to demonstrate that any of the companies that he defrauded violated HUD procedures, or that the Government knew or should have known of such violations.[4]

---

[4] Petitioner also contends that recent mortgage fraud cases brought against lenders in the Southern District of New York suggest that the Government should have known that Petitioner' victims were in

8

Next, Petitioner relies on the facts brought to light in *Barkley v. Olympia Mortgage*, No. 04 Civ. 875 (E.D.N.Y. June 1, 2011). Petitioner explains that in *Barkley*, Bayview Financial—the victim of Petitioner's misconduct relating to the 1065 Fulton Street transaction—was sanctioned for obstructing the discovery process and lying about its role in certain fraudulent mortgage transactions. (9/29/2011 Submission 12). Petitioner highlights the fact that Bayview turned out to be the initial purchaser of a mortgage that it later purchased on the secondary mortgage market, and contends that Bayview acted similarly in the 1065 Fulton Street scheme. (*See id.* at 12, 14-18). But the mere fact that Bayview committed fraud in another action does little to prove that any evidence in Petitioner's case was actually false, or, more importantly, that the Government knowingly presented such false evidence. Nor does this argument support Petitioner's contention that the Government concealed vital documents relating to HUD policies and procedures; although the *Barkley* jury reviewed some of Bayview's HUD-related documents, Petitioner concedes that those documents are not the same type he alleges the Government concealed in his case. (*Id.* at 20).

Finally, Petitioner claims prosecutorial misconduct arising out of the subsequent guilty plea of Bayview owner and manager Steven Gordon, one of the witnesses who testified at his trial. In January 2009, approximately six years after Petitioner's convictions, Gordon pleaded guilty to one count of wire fraud under 18 U.S.C. §1343, and admitted to participating in a scheme to inflate the value of certain Bayview loans. (*See* Gov.'s 2/11/2010 Br. 5 [Cv. Dkt. No.

---

fact loan originators. (*See* 4/4/2012 Submission 3 (citing *United States ex rel Belli v. Allied Home Mortg. Corp.*, No. 11 Civ. 5443 (Marrero, J.); *United States ex rel Hunt v. Citigroup Inc.*, No. 11 Civ. 5473 (Marrero, J.); *United States v. Flagstar Bank, N.A.*, No. 12 Civ. 01392 (Forrest, J.)). Although these cases demonstrate that prosecutors in the Southern District understand complex mortgage fraud schemes (*see id.* at 5-6), Petitioner has not demonstrated how the cited cases bear any relevance to his case.
   Similarly unconvincing are the asserted "parallels" between the alleged prosecutorial misconduct in this case and the highly publicized prosecutorial misconduct in the investigation of former Senator Ted Stevens. (*See* 4/4/2012 Submission 6-10).

8]). Petitioner claims that this fact supports his argument that the Government knowingly presented false evidence. Again, however, Petitioner fails to explain why Gordon's subsequent guilty plea, to misconduct distinct from Petitioner's crimes, proves that Gordon's trial testimony was false. In fact, Gordon's trial testimony, which focused on the general processes Bayview used to decide whether to purchase a mortgage, was largely corroborated by representatives of other mortgage companies. (*See* Gov.'s 2/11/2010 Br. 6-7).[5]

With regard to each of these asserted instances of prosecutorial misconduct, Petitioner has failed to demonstrate "any reasonable likelihood that the false testimony could have affected the judgment of the jury." *Helmsley*, 985 F.2d at 1205 (internal quotation marks omitted). Petitioner has failed to rebut any of the myriad false statements that the Government proved he made in the straw purchaser loan applications. In an effort to obfuscate this point, Petitioner attempts to cast doubt on various strategic decisions made by the Government—such as the Government's decision to call a witness from Bayview but not from other companies under HUD investigation, and the Government's objections to the cross examination of FBI Agent Kathryn Batt. (*See* 5/18/2009 Submission 29; 11/14/2011 Submission 17). But these decisions are strategic ones. Petitioner's arguments hardly suggest that the Government presented any false evidence or committed any other prosecutorial misconduct, nor do they negate Petitioner's proven misconduct.[6]

### B. Exculpatory and Impeachment Information

Petitioner next argues that the Government failed to provide exculpatory and impeachment information as required under *Brady*, *Giglio*, and Federal Rule of Criminal

---

[5] Acknowledging that Gordon's guilty plea occurred approximately six years after his trial testimony, Petitioner can merely speculate regarding how the Government should have been alerted, at the time of trial, to Gordon's misconduct. (*See* 11/11/2009 Submission 16).

[6] Given that the Government committed no prosecutorial misconduct in this case, the Court also rejects Petitioner's requests for sanctions. (*See* 9/29/2011 Submission 20).

10

Procedure 16(a)(1)(E), thus violating Petitioner's right to a fair trial. The Government must disclose evidence favorable to the accused when it is material to defendant's guilt or punishment,[7] including evidence that could be used to impeach Government witnesses. *See Brady*, 373 U.S. at 87; *United States v. Madori*, 419 F.3d 159, 169 (2d Cir. 2005) (citing *Giglio*, 405 U.S. at 154). Violations of this duty occur when: (1) the material evidence is "favorable to the accused, either because it is exculpatory, or because it is impeaching," (2) the evidence was "suppressed by the State, either willfully or inadvertently," and (3) prejudice ensued. *See Madori*, 419 F.3d at 169 (citing *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999)).

Petitioner's submissions point to a variety of evidence that he claims should have been produced. In particular, Petitioner argues that the Government failed to disclose: (1) information relating to HUD policies and procedures (*see* 5/18/2009 Submission 24; 11/11/2009 Submission, 16), (2) HUD and DOJ investigations of Island Mortgage Network ("IMN") and First National Funding of New Jersey ("FNF") (*see* 11/11/2009 Submission 8-12), and (3) Steven Gordon's guilty plea to mortgage fraud (*see* 1/19/2010 Submission). Although much of Petitioner's claim is procedurally barred, even considering these contentions on their merit, the Court finds that the evidence does not support Petitioner's claim.[8]

---

[7] Petitioner and the Government dispute the appropriate materiality standard. Petitioner argues that due to the purported presence of prosecutorial misconduct in this case, the proper standard is whether there is "any reasonable likelihood that the false testimony affected the judgment of the jury." *See Agurs*, 427 U.S. at 103. Having determined that Petitioner's prosecutorial misconduct claim is without merit, however, the Court will apply the generally applicable materiality standard: "[f]or *Brady* purposes, information is material 'if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.'" *United States v. Madori*, 419 F.3d 159, 169 (2d Cir. 2005) (quoting *Pennsylvania v. Ritchie*, 480 U.S. 39, 57 (1987)). "A 'reasonable probability' is a probability 'sufficient to undermine confidence in the outcome.'" *Id.* at 169.

[8] Petitioner argued on appeal that "the Government withheld exculpatory information," including information regarding FNF's misconduct. (*See* Appellant's 6/30/2004 Br. 12, 20) The Second Circuit considered and rejected this argument, thus barring Petitioner from raising it now. *See Yick Man*, 614 F.3d at 53. Furthermore, Petitioner failed to raise his Rule 16 argument on appeal, and thus is again procedurally barred. *Massaro*, 538 U.S. at 504. Petitioner has also failed to demonstrate that his Rule 16 argument is cognizable under Section 2255, which "provides a remedy . . . for 'constitutional error . . . or

Petitioner repeatedly argues that the Government should have produced HUD "policies and procedures" that would have allowed him to demonstrate that the alleged victims were actually loan originators engaged in wrongful lending practices. (*See* 5/18/2009 Submission 18-19; 11/11/2009 Submission 32-37.)  The Court finds, however, that Petitioner has failed to show that these HUD policies and procedures would have been exculpatory, that the Government suppressed this evidence, or that Petitioner suffered any prejudice as a result.  These policies and procedures do not rebut the numerous false statements that Petitioner made on the loan applications during the course of his role as a straw purchaser.  Those misrepresentations were the heart of Petitioner's offense conduct.  Accordingly, in light of the entire record, the Court finds no "reasonable probability" that the absence of the HUD policies and procedures undermined the verdict.  *See United States v. Payne*, 63 F.3d 1200, 1210-11 (2d Cir. 1995).

Petitioner also argues that the Government should have produced a variety of information relating to HUD and DOJ investigations of two mortgage companies—IMN and FNF.[9] Petitioner contends that these investigations revealed that IMN and FHF violated various HUD policies and were engaged in various kinds of misconduct.  Further, he argues that the investigations would have demonstrated that the secondary market companies at issue in his case were not secondary market companies at all, but were loan originators, and those companies

---

an error of law or fact that constitutes a 'fundamental defect which inherently results in a complete miscarriage of justice.'" *Graziano v. United States*, 83 F.3d 587, 589-90 (2d Cir. 1996) (citations omitted).  The Court finds that Petitioner has not alleged "a fundamental defect which inherently results in a complete miscarriage of justice, nor an omission inconsistent with the rudimentary demands of fair procedure." *Hill*, 368 U.S. at 428.

Petitioner also fails to establish "cause and prejudice" to excuse his procedural defaults. Petitioner asserts, for example, that it was reasonable for him to believe that no additional exculpatory material was available from certain files that were destroyed in the 9/11 attacks because the Government produced some materials from the "'destroyed' HUD 625 Franklin Ave. case file." (3/9/2009 Submission 17). But Petitioner never demonstrates that any allegedly exculpatory evidence was in the destroyed case file or otherwise in the Government's possession. Importantly, Petitioner makes no argument that he was actually prejudiced by "infecting his entire trial with error of constitutional dimensions." *Frady*, 456 U.S. at 170; (*see also* 5/18/2009 Submission 18).

[9] FNF approved Petitioner's false loan application relating to 625 Franklin Avenue.  (PSR ¶ 148).

were not defrauded by the Enterprise, but were part of the scheme.  (*See* 5/18/2009 Submission 15; 11/11/2009 Submission 1-3).

Once again, however, Petitioner does not explain how the HUD enforcement actions and DOJ criminal proceedings are material or exculpatory.[10]  First, Petitioner does not connect IMN to the facts of his case.  Second, even assuming the truth of Petitioner's allegations about unrelated misconduct of FNF, he fails to establish that FNF was aware of and was part of the charged scheme in this case.  In particular, Petitioner does not explain how any misconduct by FNF that was completely unrelated to Petitioner's fraud is evidence that FNF was not a victim in this case.  Finally, Petitioner fails to establish how this evidence rebuts his own fraudulent misconduct.  Although Petitioner argues that this evidence would have led the jury to conclude that he did not intend to defraud (*see* 11/11/2009 Submission 20-23), this argument does not plausibly account for Petitioner's repeated lies on the loan applications.

The final disclosure that Petitioner argues the Government should have made is evidence of Steven Gordon's misconduct.  Petitioner claims this nondisclosure violated both his rights under *Brady* and his rights under *Giglio*.  He argues that Gordon's misconduct and subsequent plea constitute exculpatory and impeachment evidence supporting Petitioner's argument that Bayview was not a victim.  (*See* 1/19/2010 Submission 4); *see also United States v. Bagley*, 473

---

[10] Petitioner attributes knowledge of these investigations to the prosecution through FBI Agent Kathryn Batt.  (*See* 5/18/2009 Submission 14; 11/11/2009 Submission 5).  Even assuming that Petitioner accurately characterizes Agent Batt's knowledge of these investigations, Petitioner has failed to demonstrate that Agent Batt acted as an "arm of the prosecution," thus making her knowledge attributable to the prosecution.  (5/18/2009 Submission 14 (citing *Kyles*, 514 U.S. at 438-39; *United States v. Morell*, 524 F.2d 550, 555 (2d Cir. 1975))).  To determine whether a person qualifies as an "arm of the prosecution," the relevant question "is what the person *did*, not who the person *is*."  *United States v. Stewart*, 433 F.3d 273, 298 (2d Cir. 2006) (government official who was not involved with investigation or presentation of case to grand jury, but acted only as an expert witness, found not to be "arm of prosecution"). Petitioner offers little argument to this point.  Nevertheless, this opinion addresses the merits of Petitioner's argument.

U.S. 675, 676 (1985). Petitioner argues that the Government possessed and suppressed this information.

While conceding that Gordon's guilty plea would constitute impeachment evidence (Gov.'s 2/11/2010 Br. 7), the Government persuasively demonstrates that this evidence cannot serve as the basis of a *Brady*, *Giglio*, or Rule 16 claim. First, the Government could not have suppressed the evidence at Petitioner's trial because Gordon's guilty plea in the Southern District of Florida did not occur until six years after he testified at Petitioner's trial. (*Id.* at 5-9). Petitioner counters that the Government should have known about Gordon's misconduct at the time of trial because the Government had knowledge about misconduct at IMN and FNF, and should have extrapolated from that, that there was misconduct at Bayview. (*See* 1/19/2010 Submission 5; 3/8/2010 Submission 3). This speculation is unpersuasive given that Gordon was not charged with a crime until several years after his trial testimony. (*See* Gov.'s 2/11/2010 Br. 6, 9). Even if the Government had been aware of Gordon's misconduct at the time of trial, because the misconduct is unrelated to the mortgage fraud scheme conducted by the Argentina Enterprise, Petitioner has not shown that the evidence would have proven that Bayview was complicit in the Enterprise's schemes or somehow mitigated Petitioner's fraudulent acts. Thus, the absence of this evidence could not have prejudiced Petitioner. The lack of prejudice is confirmed by the fact that Gordon's testimony was corroborated by other witnesses at trial. *See supra* text accompanying note 5; *Payne*, 63 F.3d at 1210 ("[A] new trial is generally not required when the testimony of the witness is 'corroborated by other testimony.'").[11]

---

[11] Even construing Petitioner's submissions as a motion for a new trial based on newly discovered evidence, such an application is without merit. First, the motion is well beyond the three year time limit. *See* Fed. R. Crim. Proc. 33(b)(1); *see also United States v. Robinson*, 430 F.3d 537, 542 (2d Cir. 2005) (though not jurisdictional, Rule 33's three year time limit is to be "strictly enforced"). Second, the potential new evidence, such as Steven Gordon's guilty plea, though somewhat relevant for impeachment,

14

In sum, Petitioner has not shown that the Government suppressed any material evidence or that any prejudice ensued. Accordingly, the Court rejects Petitioner's claim.

## IV.     CONCLUSION

For the reasons set forth above, the Court DENIES Petitioner's motion to vacate, set aside, or correct his sentence pursuant to Section 2255. A certificate of appealability will not issue because Petitioner has not made a substantial showing of the denial of a constitutional right. *See* 28 U.S.C. § 2253(c)(2); Fed. R. App. P. 22(b).

The Clerk of the Court is directed to close this case. Any pending motions are moot.

SO ORDERED.

DATED:   New York, New York
         March 12, 2013

/s/_____
KIMBA M. WOOD
United States District Judge

---

is insufficient to suggest that a new trial would "likely result in an acquittal." *United States v. Owen*, 500 F.3d 83, 88 (2d Cir. 2007); *United States v. Spencer*, 4 F.3d 115, 118 (2d Cir. 1993).